USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: October 9, 2018

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

TODD DIAMOND,

                Plaintiff,

         -v.-

THOMAS CALAWAY, LISA CALAWAY,
and SANDRA CALAWAY,

                Defendants.

18 Civ. 3238 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

    Plaintiff brings this action to recover funds allegedly loaned to, but never repaid by, Defendant Thomas Calaway ("Mr. Calaway"). Plaintiff alleges that Mr. Calaway conspired with his wife, Lisa Calaway ("Mrs. Calaway"), and his mother, Sandra Calaway ("S. Calaway," and together with Mrs. Calaway, the "Moving Defendants"), to defraud Plaintiff out of funds totaling $500,000. Plaintiff advances several causes of action, including breach of contract and negligent misrepresentation claims against Mr. Calaway; a fraudulent misrepresentation claim against Mr. and Mrs. Calaway; and unjust enrichment, civil conspiracy, and aiding and abetting fraud claims against all three Defendants.

    Pending before the Court is the Moving Defendants' motion to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2). For the reasons set forth below, the motion is granted in part and denied in part.

## BACKGROUND[1]

### A. Factual Background

At all relevant times, Plaintiff was a member of Nima Scrap LLC ("Nima"), a company whose business plan was to purchase raw metal from Chile, and then process and resell the metal. (Compl. ¶¶ 8-9). Beginning in November 2011, Plaintiff provided Nima with $650,000 in funding. (*Id.* at ¶ 10). In July 2012, Plaintiff personally guaranteed a $500,000 bridge loan that Nima had taken out to cover business expenses. (*Id.* at ¶ 11). But Plaintiff's funding efforts proved to be insufficient, and by early 2013, Nima required additional funds to remain afloat. For reasons not explained in the pleadings, Plaintiff was unable to provide further funding directly to Nima. (*Id.* at ¶ 12).

Instead, Plaintiff entered into an arrangement with Mr. Calaway that would, in somewhat circuitous fashion, provide Nima with short-term funding. (Compl. ¶ 13). Under the arrangement, Plaintiff would lend money to Mr. Calaway, who would use that money to secure other leveraged assets that, in turn, would enable Mr. Calaway both to repay Plaintiff and to provide Nima with $700,000 to service its bridge loan. (*Id.* at ¶¶ 13-14). The plan initially called for Plaintiff to provide Mr. Calaway with a loan of $250,000 (the "First Loan"), in exchange for (i) a promissory note in which Mr. Calaway agreed to

---

[1] The facts in this Opinion are drawn from Plaintiff's Complaint ("Compl." (Dkt. #6)), filed on April 16, 2018. In adjudicating the pending motion to dismiss, the Court accepts as true the well-pleaded allegations in the Complaint. *See In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (per curiam). For ease of reference, the Court refers to Moving Defendants' opening brief as "Def. Br." (Dkt. #25); to Plaintiff's opposition brief as "Pl. Opp." (Dkt. #29); and to Moving Defendants' reply brief as "Def. Reply" (Dkt. #34).

pay Plaintiff $250,000 with interest on March 5, 2013 (the "Written Note"); (ii) a written personal guaranty by Mr. Calaway (the "Written Guaranty"); and (iii) a commitment by Mr. Calaway to invest $700,000 in Nima. (*Id.* at ¶ 15). Mr. Calaway assured Plaintiff that he would have sufficient assets to repay Plaintiff in a timely fashion. (*Id.* at ¶ 16). However, Plaintiff alleges that "Mr. Calaway never intended to repay [Plaintiff] or invest the funds in Nima — instead, Mr. Calaway intended to take the funds and use [them] for the Calaways' benefit." (*Id.* at ¶ 19).

On February 19, 2013, Mr. Calaway executed the Written Note and Written Guaranty. (Compl. ¶ 23). Plaintiff then wired $150,000 on February 20, and $100,000 on February 22, to a bank account owned and controlled by Mrs. Calaway. (*Id.* at ¶ 24). Plaintiff alleges that Defendants deliberately used Mrs. Calaway's bank account to make it more difficult for Plaintiff to recover the disputed funds: By using that account, Defendants ensured that Mr. Calaway could "subsequently claim that he personally lacked the financial resources to perform his obligations to [Plaintiff]." (*Id.* at ¶ 22). Plaintiff alleges that Mrs. Calaway "offered substantial assistance to the Calaway Scheme by permitting or directing that the funds received from [Plaintiff], which the Calaways had no intention of repaying, should be funneled through [her] account[.]" (*Id.* at ¶ 21).

Mr. Calaway failed to repay Plaintiff in March 2013, as required under the Written Note and Written Guaranty. (Compl. ¶ 26). Despite this, in April 2013, Plaintiff negotiated a second agreement with Mr. Calaway. (*Id.* at

3

¶ 27). Under this second, oral contract, Plaintiff agreed to lend Mr. Calaway an additional $250,000 (the "Second Loan"), in exchange for which Mr. Calaway agreed to repay that loan with 15% interest due within 45 days. (*Id.*). During various exchanges in April 2013, Mr. Calaway represented that he intended to repay the full amount owed under the Written Note and the oral agreement; that he planned to provide the contemplated funding for Nima; and that he had sufficient funds to do so. (*Id.* at ¶ 28). Plaintiff claims that each of these statements was false. (*Id.* at ¶ 29).

As with the First Loan, Mrs. Calaway is alleged to have played an important role in persuading Plaintiff to wire the Second Loan to Mr. Calaway. She "personally told [Plaintiff] it was necessary that he quickly wire the money to the same account owned and controlled by her[.]" (Compl. ¶ 32). As before, Defendants instructed Plaintiff to send the funds to Mrs. Calaway's account in order "to shield the money so that Mr. Calaway could claim he was unable to repay the loan, in furtherance of the Calaway Scheme." (*Id.* at ¶ 33). On April 26, 2013, Plaintiff wired the Second Loan, totaling $250,000, to Mrs. Calaway's account. (*Id.* at ¶ 34).

Mr. Calaway failed to repay the Second Loan within 45 days, as required under the oral agreement. (Compl. ¶ 36). He also failed to repay the amount due under the Written Note and Written Guaranty. (*Id.*). In an effort to "conceal[ ] the Calaway Scheme," S. Calaway, Mr. Calaway's mother, "assured [Plaintiff] no [fewer] than three times over the telephone that there was … a trust interest that would soon be released to Mr. Calaway, and that Mr.

4

Calaway would repay [Plaintiff] once the trust interest was released." (*Id.* at ¶¶ 37-38). Her statements, just like those made by Mr. and Mrs. Calaway, were false and intended merely to prevent Plaintiff from attempting to recover the disputed funds. (*Id.* at ¶ 39). To date, Mr. Calaway has failed to repay the $500,000 in loans or any interest and fees in connection thereto. (*Id.* at ¶ 40).

**B.     Procedural Background**

Plaintiff filed his Complaint on April 16, 2018. (Dkt. #6). The Court held an initial conference on July 12, 2018, during which Moving Defendants indicated that they intended to file a motion to dismiss for lack of personal jurisdiction. (*See* Dkt. #27). Moving Defendants filed their motion on July 27, 2018. (Dkt. #24-25). Plaintiff filed his opposition brief on August 17, 2018. (Dkt. #29). Moving Defendants filed their reply on August 24, 2018. (Dkt. #34).

## DISCUSSION

**A.     Applicable Law**

**1.     Motions to Dismiss Under Federal Rule of Civil Procedure 12(b)(2)**

When a defendant brings a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(2), "the plaintiff bears the burden of establishing that the court has jurisdiction over the defendant." *DiStefano* v. *Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001) (citation omitted); *accord In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013). "Prior to discovery, a plaintiff challenged by a jurisdiction testing motion may defeat the motion by pleading in good faith, legally sufficient allegations of jurisdiction.

5

At that preliminary stage, the plaintiff's *prima facie* showing may be established solely by allegations." *Dorchester Fin. Sec., Inc.* v. *Banco BRJ, S.A.*, 722 F.3d 81, 84-85 (2d Cir. 2013) (per curiam) (citation omitted). All jurisdictional allegations "are construed in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor[.]" *A.I. Trade Fin., Inc.* v. *Petra Bank*, 989 F.2d 76, 79-80 (2d Cir. 1993). However, the court "will not draw argumentative inferences in the plaintiff's favor" and need not "accept as true a legal conclusion couched as a factual allegation[.]" *In re Terrorist Attacks*, 714 F.3d at 673 (citations omitted); *see also Licci ex rel. Licci* v. *Lebanese Canadian Bank, SAL*, 673 F.3d 50, 59 (2d Cir. 2012).

District courts deciding motions to dismiss for lack of personal jurisdiction typically engage in a two-part analysis. *First*, the court assesses whether there is "a statutory basis for exercising personal jurisdiction." *Marvel Characters, Inc.* v. *Kirby*, 726 F.3d 119, 128 (2d Cir. 2013). In making this determination, the court "applies the forum state's personal jurisdiction rules" unless a federal statute "specifically provide[s] for national service of process." *PDK Labs, Inc.* v. *Friedlander*, 103 F.3d 1105, 1108 (2d Cir. 1997) (internal quotation marks and citations omitted). *Second*, if there is a statutory basis for personal jurisdiction, the court must decide whether the exercise of jurisdiction comports with due process. *Sonera Holding B.V.* v. *Çukurova Holding A.Ş.*, 750 F.3d 221, 224 (2d Cir. 2014) (per curiam).

The two-step analysis may be obviated by a valid forum-selection clause. Indeed, "[p]arties can consent to personal jurisdiction through forum-selection

6

clauses in contractual agreements." *D.H. Blair & Co.* v. *Gottdiener*, 462 F.3d 95, 103 (2d Cir. 2006) (citing *Nat'l Equip. Rental, Ltd.* v. *Szukhent*, 375 U.S. 311, 315-16 (1964)). Where there is an enforceable forum-selection clause, "it is not necessary to analyze jurisdiction under New York's long-arm statute or federal constitutional requirements of due process." *American S.S. Owners Mut. Protection & Indem. Ass'n, Inc.* v. *Am. Boat Co.*, No. 11 Civ. 6804 (PAE), 2012 WL 527209, at *2 (S.D.N.Y. Feb. 17, 2012) (internal quotation marks and citation omitted). "This is so because '[a]n enforceable forum selection clause amounts to consent to personal jurisdiction.'" *Gordian Grp., LLC* v. *Syringa Exploration, Inc.*, 168 F. Supp. 3d 575, 581 (S.D.N.Y. 2016) (quoting *Farrell Lines Inc.* v. *Columbus Cello-Poly Corp.*, 32 F. Supp. 2d 118, 127 (S.D.N.Y. 1997)).

### 2. New York's Long-Arm Statute

It is well established that "[a] district court's personal jurisdiction is determined by the law of the state in which the court is located." *Spiegel* v. *Schulmann*, 604 F.3d 72, 76 (2d Cir. 2010). Here, the parties agree that the relevant law in assessing the statutory basis, if any, for jurisdiction over the Moving Defendants is New York's long-arm statute. That statute authorizes courts to exercise personal jurisdiction "over any non-domiciliary … who in person or through an agent … transacts any business within the state," so long as the cause of action "aris[es] from" that transaction. N.Y. C.P.L.R. § 302(a)(1). Accordingly, a court may exercise personal jurisdiction over a non-domiciliary if two conditions are met: "first, the non-domiciliary must

7

transact business within the state; second, the claims against the non-domiciliary must arise out of that business activity.'" *Aquiline Capital Partners LLC* v. *FinArch LLC*, 861 F. Supp. 2d 378, 386 (S.D.N.Y. 2012) (quoting *CutCo Indus., Inc.* v. *Naughton*, 806 F.2d 361, 365 (2d Cir. 1986)).

The Second Circuit has articulated four relevant factors when determining whether a defendant transacts business in New York via contract. They are:

> (i) whether the defendant has an on-going contractual relationship with a New York corporation; (ii) whether the contract was negotiated or executed in New York and whether, after executing a contract with a New York business, the defendant has visited New York for the purpose of meeting with parties to the contract regarding the relationship; (iii) what the choice-of-law clause is in any such contract; and (iv) whether the contract requires franchisees to send notices and payments into the forum state or subjects them to supervision by the corporation in the forum state.

*Sunward Electronics, Inc.* v. *McDonald*, 362 F.3d 17, 22-23 (2d Cir. 2004) (quoting *Agency Rent A Car Sys., Inc.* v. *Grand Rent A Car Corp.*, 98 F.3d 25, 29 (2d Cir. 1996)). "Although all factors are relevant, no one factor is dispositive and other factors may be considered." *Id.* at 23. Courts must ultimately decide "based on the totality of the circumstances." *Id.* (quoting *Agency Rent A Car Sys.*, 98 F.3d at 29).

**B.  Analysis**

Plaintiff identifies two bases for personal jurisdiction over Mrs. Calaway and S. Calaway. *First*, Plaintiff points to the forum-selection clauses in the

8

Written Guaranty and the Written Note, signed by Mr. Calaway. Though neither Mrs. Calaway nor S. Calaway signed these agreements, Plaintiff asserts that the Court may nevertheless enforce the forum-selection clause against them because they are "'closely related' to the dispute." (Pl. Opp. 1). *Second*, Plaintiff asserts that at least one of the written agreements used to defraud Mr. Calaway "was executed, delivered, and accepted in the City of New York." (*Id.* at 8 (citing Section 7(E) of the Written Guaranty)). Plaintiff asserts that, although neither Mrs. Calaway nor S. Calaway was a party to the Written Guaranty, their status as co-conspirators binds them to its terms, which show that the Defendants purposely availed themselves of, and engaged in tortious conduct in, the State of New York.

### 1. The Court May Exercise Personal Jurisdiction over Mrs. Calaway

The Court begins with Mrs. Calaway, and in particular with Plaintiff's argument that the forum-selection clause in the Written Guaranty and Written Note suffices to establish personal jurisdiction over her. As Plaintiff puts it, "the real question ... is whether [Mrs.] Calaway[ ], who conspired with ... [her] husband to defraud Mr. Diamond — using, in part, a contract with a New York forum-selection clause — [is] 'closely related' to the dispute such that [she has] to answer for [her] actions in New York." (Pl. Opp. 1).

Under the "closely related" doctrine, "a non-party to a contract may be subject to its forum selection clause if the non-party is so 'closely related' to either the parties to the contract or the contract dispute itself that enforcement of the clause against the non-party is foreseeable." *Recurrent Capital Bridge*

9

*Fund I, LLC* v. *ISR Systems & Sensors Corp.*, 875 F. Supp. 2d 297, 307 (S.D.N.Y. 2012). "[M]any courts have used the doctrine to bind non-party, non-signatory corporate officers to contracts entered into by their corporate employer[s]," *id.* (collecting cases), particularly where the non-party's interests are "completely derivative of and directly related to, if not predicated upon the signatory party's interests or conduct," *Cuno, Inc.* v. *Hayward Indust. Prod., Inc.*, No. 03 Civ. 3076 (MBM), 2005 WL 1123877, at *6 (S.D.N.Y. May 10, 2005) (internal quotation marks and citation omitted). Others have used the doctrine to bind non-signatories who "acted in concert" with the signatories. *See, e.g.*, *Weingard* v. *Telepathy, Inc.*, No. 05 Civ. 2024 (MBM), 2005 WL 2990645, at *5-6 (S.D.N.Y. Nov. 7, 2005). "Regardless of the specific application, the enforcement of the forum selection clause against the non-party must have been foreseeable prior to suit, which implies that the non-signatory must have been otherwise involved in the transaction in some manner." *Recurrent Capital Bridge Fund I*, 875 F. Supp. 2d at 307-08.

Here, Plaintiff has adequately alleged that Mrs. Calaway was "closely related" to the fraudulent scheme that was, in large part, enabled by Mr. Calaway's execution of a Written Note and Written Guaranty with a New York forum-selection clause. Mrs. Calaway "offered substantial assistance to the Calaway Scheme by permitting or directing that the funds received from [Plaintiff], which the Calaways had no intention of repaying, should be funneled through [her] account[.]" (*Id.* at ¶ 21). She and Mr. Calaway directed Plaintiff to send the funds to her account to ensure "that Mr. Calaway [c]ould

10

subsequently claim that he personally lacked the financial resources to perform his obligations to [Plaintiff]." (*Id.* at ¶ 22). And in April 2013, she "personally told [Plaintiff] it was necessary that he quickly wire the money to the same account owned and controlled by her[.]" (*Id.* at ¶ 32).

Read in the light most favorable to Plaintiff, as required at this stage of the litigation, the pleadings suggest that Mrs. Calaway was intimately involved in the scheme to defraud Plaintiff of the disputed funds; that she knowingly participated in that scheme, including by making her personal bank account available to advance the fraud; and that her participation began before Plaintiff had wired any funds to Mr. and Mrs. Calaway. Given her close relationship to Mr. Calaway and her direct, early involvement in the fraudulent scheme, it was reasonably foreseeable to her that Plaintiff would bring suit to enforce the Written Note and Written Guaranty in New York, and that when he did so, he would name her as Mr. Calaway's co-conspirator.

Though Moving Defendants are correct that the pleadings "contain no allegations that [Mrs. Calaway was] aware of the terms of the contract," courts have not required allegations of actual knowledge in order to apply the "closely related" doctrine. In *Weingard*, for example, a sister court in this District applied the "closely related" doctrine after finding that three corporate defendants "acted in concert to deprive [Plaintiff]" of a contractual right. 2005 WL 2990645, at *6. The *Weingard* Court did not require that the plaintiff affirmatively allege that the non-signatories were aware of the terms of the agreement at issue. Other courts in this District have done similarly. *See, e.g.*,

11

*Cuno, Inc.*, 2005 WL 1123877, at *6. In fact, this Court is unaware of any case where application of the "closely related" doctrine turned on affirmative allegations of the non-parties' familiarity with the forum-selection clauses at issue.

Here, the allegations regarding Mrs. Calaway's close relationship to Mr. Calaway, signatory to the Written Note and Written Guaranty, and her early and extensive involvement in the fraudulent scheme suffice to justify application of the "closely related" doctrine. The Court therefore finds that it may enforce the relevant forum-selection clause against Mrs. Calaway, and thereby exercise personal jurisdiction over her. The Court therefore need not analyze whether New York's long-arm statute provides an independent basis to exercise personal jurisdiction over Mrs. Calaway.

### 2. The Court Lacks Personal Jurisdiction over S. Calaway

The Court next turns to S. Calaway, Mr. Calaway's mother. Compared to the pleadings against Mr. and Mrs. Calaway, those detailing S. Calaway's involvement in the fraudulent scheme are sparse. Plaintiff alleges only that Mrs. Calaway "assured [him] no less than three times over the telephone that there was ... a trust interest that would soon be released to Mr. Calaway, and that Mr. Calaway would repay [Plaintiff] once the trust interest was released." (Compl. ¶¶ 37-38). These alleged communications took place "after [Plaintiff] had wired Mr. Calaway ... the second loan[.]" (*Id.* at ¶ 38). Unlike Mrs. Calaway, there is no suggestion that S. Calaway was involved with the scheme until after the Written Note and Written Guaranty were executed, and after

12

Plaintiff had wired all of the disputed funds to Mrs. Calaway's bank account. The only allegation specific to S. Calaway is that she attempted to reassure Plaintiff, sometime in April or May 2013, that her son would soon have sufficient funds to repay Plaintiff.

S. Calaway's alleged participation in the scheme, in other words, was largely peripheral, and only materialized after the contracts were executed and the funds transferred. The Court finds that her participation was not sufficiently "closely related" to permit this Court to enforce the relevant forum-selection clause against her. There is no allegation that Plaintiff relied on S. Calaway's statements when he signed the Written Note, or when he transferred $500,000 to Mrs. Calaway's bank account. Similarly, there is no allegation that S. Calaway was involved in the scheme to persuade Mr. Calaway to send the disputed funds to Mr. and Mrs. Calaway. Instead, the only claim is that she became involved after the fact, in order to conceal the fraudulent scheme, or perhaps more likely, to forestall any legal action to recover the disputed funds. While the allegations may be sufficient to state a claim against S. Calaway in *some* court, they are insufficient to establish that it was reasonably foreseeable to S. Calaway that she might be hauled into *this* court by force of the forum-selection clause in the Written Note and Written Guaranty. Accordingly, the Court rejects Plaintiff's argument that the "closely related" doctrine permits this Court to enforce the forum-selection clause against S. Calaway.

For the same reason, the Court rejects Plaintiff's argument that it may exercise personal jurisdiction over S. Calaway because "at least one contract used to defraud Mr. Calaway was executed, delivered, and accepted in the City of New York." (Pl. Opp. 8). To be sure, New York's long-arm statute authorizes courts to exercise personal jurisdiction "over any non-domiciliary ... who in person or through an agent ... transacts any business within the state" so long as the cause of action "aris[es] from" that transaction. N.Y. C.P.L.R. § 302(a)(1). But here, there is no suggestion that S. Calaway executed the contract that was delivered and accepted in New York, or that she ever did business in New York.

Plaintiff seeks to establish long-arm jurisdiction over S. Calaway by arguing that "co-conspirators cannot send one person into a state to further their fraud and then have the rest hide from the state's courts once an action is brought." (Pl. Opp. 8-9 (citing *Bonavire* v. *Wampler*, 779 F.2d 1011, 1014 (4th Cir. 1985))). This argument fails for at least two reasons. *First*, Plaintiff has failed adequately to allege that S. Calaway had any involvement in the fraudulent scheme until after Plaintiff signed the contracts and wired the funds at issue. S. Calaway's role was limited to offering assurances, after Mr. and Mrs. Calaway had already persuaded Plaintiff to send funds and to sign a contract that was delivered and accepted in New York, that Mr. Calaway would be able to repay Plaintiff. There is no suggestion that, once S. Calaway began to participate in the fraudulent scheme, Defendants had any contact with, committed a tort in, or engaged in business activities in New York.

14

*Second*, the sole case on which Plaintiff relies for the proposition that co-conspirators are subject to personal jurisdiction where the offending contract is executed and delivered — *Bonavire*, 779 F.2d at 1011 — is neither binding on this Court nor factually on-point. Indeed, in *Bonavire*, the Fourth Circuit found that, although only one defendant had ever physically been present in the relevant jurisdiction, that person acted "as the soliciting agent for the enterprise in which [the co-defendants] were involved." *Id.* at 1014. The record "revealed that [the co-defendants] engaged [him] to act as the escrow agent for the loan[,]" such that his acts "in enticing the plaintiffs to participate in the fraudulent scheme [we]re attributable to all defendants and provide[d] a basis for jurisdiction over them." *Id.* There, the out-of-state defendants had played an active role in advancing the fraudulent scheme from the beginning. *Id.* at 1013-14. They had met with the plaintiffs and engaged in contract negotiations. *Id.* Here, S. Calaway's participation was far more limited than that of the *Bonavire* co-defendants. Unlike in *Bonavire*, there are no allegations that S. Calaway was involved in the fraudulent scheme until after the contracts were signed and until after Plaintiff had already wired $500,000 to Mr. and Mrs. Calaway.

Given the limited nature of S. Calaway's role in the fraudulent scheme, which Plaintiff concedes was aimed merely at concealing the fraud after the fact, the Court cannot find adequate grounds on which to exercise personal jurisdiction over her. Neither the "closely related" doctrine nor Plaintiff's theory

15

of co-conspirator contact with the relevant jurisdiction provides this Court with jurisdiction over S. Calaway.

## CONCLUSION

For the reasons set forth above, the Court grants Moving Defendants' Rule 12(b)(2) motion as to S. Calaway but denies the motion as to Mrs. Calaway. The parties are directed to submit a status letter on or before November 9, 2018, advising the Court of the status of discovery and any outstanding issues, in advance of the pretrial conference on November 21, 2018.

The Clerk of Court is directed to terminate the motion at Docket Entry 24.

SO ORDERED.

Dated: October 9, 2018
        New York, New York

                                     KATHERINE POLK FAILLA
                                     United States District Judge